CLAUDIO CAPÓ, Plaintiff and Appellant, *v.* JORGE ROMANÍ, Defendant and Appellee.

No. 5828.   Argued January 27, 1933.—Decided December 1, 1933.

*Pellón & Ayuso* for appellant.   *J. Valldejuli* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

The district court, after a trial on the merits, dismissed a

revindicatory action and rendered judgment for defendant as cross-complainant. Plaintiff appeals and says that the district court erred: in holding that a deed of conveyance executed by Charles B. Colmore in favor of Claudio Capó y Capó, December 27, 1925, was ineffective for want of actual delivery of possession; in holding, after a certain finding based on certain computation, that Romaní was the owner of the land in controversy; in holding that it was incumbent on plaintiff to prove a full dominion, to wit, both ownership and possession; in holding that Romaní had any color of title on which to base a claim of prescription; in computing the prescriptive period from the date of acquisition by a common predecessor in interest of both plaintiff and defendant; in rendering judgment in favor of a party in interest who had not appeared in the action; in overruling plaintiff's demurrer for a defect of parties cross-complainants; in dismissing plaintiff's action; in rendering judgment for cross-complainant; in ordering a cancellation of the record of plaintiff's title in the registry of property; and in awarding costs to defendant.

The argument assumes that plaintiff's predecessors in interest were in constructive possession of the strip in controversy. Most of appellant's contentions depend, either for their existence or for their supposed prejudicial effect, upon the soundness of that assumption. Practically the only basis in the record for such an assumption is the fact that the deed of conveyance referred to in the first assignment was recorded in the registry of property. It is an undisputed fact that none of plaintiff's predecessors in interest back to and including the common source was, at the date of any of the deeds in plaintiff's chain of title or at any time thereafter, in actual possession of the strip in controversy. If none of these vendors was at the time of his conveyance the owner of that strip, his deed could not vest any title thereto in the vendee. The recording of the Colmore deed did not confer upon Capó any better title than Colmore had.

Plaintiff must recover, if at all, upon the strength of his own title. Unless Colmore was the owner of the land in controversy and was shown by evidence adduced at the trial to be such owner, any error that the district court may have committed as to the consequences flowing from a failure to deliver actual possession and most of the other errors specified by appellant need not be discussed.

In 1906, Courtenay Camplejohn Nairn y Perpal was the owner of three *cuerdas* of land, the remainder of eleven *cuerdas* previously acquired and in part disposed of by him. From this parcel of three *cuerdas* he segregated and sold July 12, 1906, to Charles M. Boerman, 1337.05 meters, bounded on the north, 27.50 meters, by the maritime zone; on the south, 28 meters, by another lot belonging to the vendor; on the east, 44 meters, by land belonging to Elías Allende, formerly heirs of Allende; and on the west, 55.50 meters, by another lot property of the vendor measuring 26.50 meters on the north and 27 meters on the south, toward the east from Nairn Avenue, which is forty feet wide. Boerman entered into possession and proceeded to indicate the boundaries of the lot by planting coconut palms along lines previously marked by stakes. Romaní derived title from Boerman. The actual possession established by Boerman has never been interrupted. The land in controversy is a strip of 189 square meters and 47 centimeters extending across the southern portion of the lot occupied by Romaní and his predecessors in interest. Its boundary lines on three sides, east, west and south, are marked by the coconut palms which Boerman planted.

In November, 1906, Nairn sold to John D. Leavitt 7,150 meters described as bounded on the north by the sea and the maritime zone and for a distance of twenty-eight meters by the Boerman lot, on the west by Nairn Avenue and on the East by land belonging to Elías Allende, now his heirs, and for a distance of fifty-five meters by Boerman. The southern boundary was Washington Street. It was stip-

ulated that a new survey would be made, and the subsequent entry in the registry of property indicates that the resurvey resulted in an excess of 212 square meters and sixty centimeters. Later, Leavitt sold this property to William M. Aitkin. Aitkin sold to Oscar M. Sewell. Sewell sold to George Dana Graves and Graves sold to Charles B. Colmore.

Colmore segregated and sold a number of lots. One of these, which he sold to Capó in March, 1919, was described as 795.77 meters, on Nairn Avenue, bounded on the north by a house belonging to Doña Catalina widow of Cuyar, and for a distance of 27 meters and 19 centimeters by a strip of land in the possession of widow Boerman, and on the east, for a distance of 5.29 meters, by the same strip, and for a distance of 8.12 meters by a lot the property of the widow Hord, formerly belonging to the heirs of Elías Allende and on the south by the remainder of the parcel from which the lot so conveyed was segregated. More specifically the deed recites that to the north and east of the lot conveyed to Capó lies a strip of land 189.47 square meters occupied by the widow Boerman but claimed by Colmore, bounded on the north 28 meters by the Boerman lot, on the east, 8.31 meters, by the Hord lot, on the south, 28 meters, and on the west, 5.29 meters, by the Capó lot. In December 1925, Colmore also sold to Capó the 189.47 meters. Capó recorded his deed and brought this action to recover the 189.47 meters.

The stenographic record of the proceedings in the district court contains a statement by counsel for plaintiff: that the trial had begun at some previous time at which some documentary evidence had been introduced; that a stipulation had been filed; that plaintiff had introduced a plat and four certificates; and that this plat and these certificates had been already marked exhibits A, B, C, D and E. Later, the record explains the impossibility of transcribing exhibit "A," the map, and says that the original will be sent up. The map is not before us and no order for its transmission seems

to have been made. It is not even mentioned in the brief for appellant.

·Exhibit "B" is a tax rendition sheet for the fiscal year 1922–23, in which a judicial administrator, as representative of the Boerman heirs, rendered the Boerman lot as containing 1614.82 square meters. The judicial administrator testi-. tified at the trial that shortly after his appointment a tax assessor appeared with this tax sheet which the witness signed; that witness at that time did not know the area of the lot; and that the only matter discussed by him with the tax assessor was the amount of the assessment. Exhibits "C" and "D" are two rendition sheets for the fiscal year 1923–24. In one, Romaní renders a 2/5 undivided interest in 1337.05 square meters. In the other, which is unsigned, the other 3/5 of the same area appear in the name of Boerman. The area given in exhibits "C" and "D" is the area specified in the deed. Exhibit "E" does not appear in the transcript.

From the deed to Boerman it appears that Nairn had previously carved out of the eleven and one-third *cuerdas* and sold three and two-thirds *cuerdas* to the Presbyterian Board of Home Missions, and four *cuerdas* to the Women's Home Missionary Society of the Methodist Episcopal Church. The registry of property shows other segregations as follows: October 1906, Benjamin S. Haywood, a lot seventy-five feet front by a hundred and forty-five more or less in depth; December 1906, 7,150 square meters to John D. Leavitt; April 1910, Haywood, a lot thirty feet in width by seventy-five feet in depth; June 1910, Frank F. Harrington, 182 feet on the north, 178 feet, 8 inches on the south, 85 feet on the east and 85 feet on the west; July 1910, Frank J. Brizzie, 178 feet 8 inches on the north, 176 feet on the south, 75 feet on the east, and 75 feet on the west; and September 1917, a strip twenty-five feet in width by 143 feet to Edward Mayers. The record does not show when Washington Street and Nairn Avenue were laid out. They are mentioned for

the first time in the deed to Leavitt. Whether they were definitely established as landmarks or existed merely on paper at that time does not appear. The area of the parcel sold to Leavitt was uncertain on the date of the conveyance. The deed from Leavitt to Aitkin contains a recital to the effect that a survey had revealed the existence of two hundred and twelve meters and sixty centimeters more than the tentative estimate specified in the deed from Nairn to Leavitt. This, without more, is not very satisfactory proof of that fact, if it be a fact. The deed from Graves to Colmore purports to convey only seven thousand three hundred and twenty-five square meters. This unexplained discrepancy of thirty-seven meters does not tend to inspire any greater confidence in the recital contained in the deed from Leavitt to Aitkin.

An arithmetical circulation made by the district judge and based on the number of meters specified in the deed from Graves to Colmore and on the sum total of the number of meters specified in the subsequent sales by Colmore, including the sale of the strip now in controversy, shows a shortage of fifty-nine square meters in addition to the one hundred and eighty-nine meters and forty-seven centimeters which Capó now seeks to recover from Romaní. In other words, Colmore's shortage on this basis would be two hundred and forty-eight meters forty-seven centimeters instead of 189.47 meters. In making this calculation, however, the district judge assumed that the difference between the area specified in the deed from Graves to Colmore and the total area of the lots segregated and sold by Colmore was a shortage, not a remainder. As a matter of fact there is no satisfactory evidence on which to base such a conclusion.

The first of the two deeds from Colmore to Capó makes no mention of any previous segregations. The lot is described as bounded on the north in part by a house belonging to a certain Catalina widow of Cuyar. Aside from this circumstance the deed reads as if the lot conveyed thereby to Capó

was the first lot sold by Colmore. The registry shows other previous sales but it also shows that most of the sales by Colmore were made after the first conveyance to Capó. The second deed to Capó states in general terms that previous segregations had been made and purports a segregation and sale of the strip now in controversy. The first deed shows that Colmore was claiming ownership of the strip which he subsequently attempted to convey. It does not show any basis for that claim. Much less does it show that the strip claimed by him had ever formed a part of the land purchased from Graves. The second deed sheds no additional light on the matter. Neither of these two deeds mentions any shortage. The obvious inference from both is that Colmore retained an unsold remainder of unspecified area.

Colmore testified as a witness at the trial. He assumes in his testimony as did the district judge in his opinion, without attempting to show, the existence of a shortage. He testified that at the time of the purchase from Graves he had a *mensura* by one Castro. He was then permitted to say without objection that Castro had told him: that there was a portion which Mrs. Boerman said belonged to her; that she was in possession of it without any right thereto; and that he (Castro) "had studied her fence" and that of witness. Colmore also said that Castro had showed him on the plat the portion occupied by Mrs. Boerman without title thereto and it was a strip "in the southern portion of her lot and another smaller piece in the western portion," and that this was the land conveyed to Capó in the second deed. This testimony, as well as the documentary evidence falls far short of establishing the existence of any shortage. As in the case of the documentary evidence, it furnishes no basis for a conclusion that the strip in controversy was included in the land conveyed by Nairn to Leavitt and subsequently by Graves to Colmore.

The showing as to the existence of any excess in the possession of defendant is equally unsatisfactory. From the

fact that a judicial administrator, in the circumstances explained by him at the trial, signed a rendition sheet specifying 1,614.82 meters instead of 1,337.05 meters as the area of the Boerman lot, it does not necessarily follow that the Boerman lot as marked upon the ground by Boerman himself contains more than the 1,337.05 meters specified in the deeds from Nairn to Boerman. The mere fact that Romaní in rendering his property for the following fiscal year described the lot as containing the number of meters specified in his deed and in the deed from Nairn to Boerman did not amount to an admission that he was in actual possession of anything in excess of that area. The testimony of Colmore falls as far short of establishing an excess in the Boerman lot as it does of establishing a shortage in the larger parcel purchased by· Colmore. This is the only evidence of any excess. Aside from this feeble showing, plaintiff had no more reason to claim an excess in the Boerman lot than he would have had to claim an excess in any of the lots segregated and sold to persons other than plaintiff by Colmore, or for that matter, in any of the lots segregated and sold by Nairn to persons other than Colmore and Boerman, or in Washington Street, or in Nairn Avenue. In any event, from the evidence before us, we have no more reason to believe that Boerman in planting his palm trees some twenty years before the commencement of the present action, encroached to the south on the land of his vendor than we would have to believe that he encroached on other lands to the east or to the west or both or on the maritime zone to the north, or that the excess in question may have been added by accretion due to a change in the coast line and the consequent shifting of the maritime zone itself.

We need not rest our decision, however, upon the failure of plaintiff to establish either a shortage or an excess. Even if plaintiff had established the existence of a shortage in the remainder actually possessed by Colmore after numerous segregations, the actual boundaries of which, as well as those

of the larger tract, were more or less uncertain, and had also established the existence of an excess over and above the area called for in the title deed of defendant, this, without more, would not have entitled him to a judgment for the amount of such excess. The outstanding fact is that plaintiff failed to establish even a constructive possession in Colmore because the strip in controversy was not shown to have been included constructively or otherwise within the boundaries specified in any of the deeds beginning with the conveyance by Nairn to Leavitt and ending with the conveyance by Graves to Colmore. If Colmore himself was not in constructive possession of the strip in controversy he could not transfer such possession to Capó. The question, then, as to whether the district court erred in holding that the deed from Colmore to Capó was ineffective for want of actual delivery of possession becomes academic, and, except as to the question of costs, the other errors, if any, were harmless.

There is nothing in the record before us upon which to base a conclusion that the district court abused its discretion in awarding the costs to defendant.

The judgment appealed from must be affirmed.